1                BEFORE THE UNITED STATES DISTRICT COURT
                    FOR THE DISTRICT OF COLUMBIA
2

3    UNITED STATES OF AMERICA,        .
                                      .  Case Number 23-cr-427-1
4              Plaintiff,             .  Case Number 24-cr-238
                                      .
5         vs.                         .
                                      .  Washington, D.C.
6    DAN EDWIN WILSON,                .  August 28, 2024
                                      .  10:19 a.m.
7              Defendant.             .
     - - - - - - - - - - - - - - - -

8

9                  TRANSCRIPT OF SENTENCING HEARING
               BEFORE THE HONORABLE DABNEY L. FRIEDRICH
10                  UNITED STATES DISTRICT JUDGE

11   APPEARANCES:

12   For the United States:      ANTHONY MARIANO, AUSA
                                 MINDY DERANEK, AUSA
13                               United States Attorney's Office
                                 601 D Street Northwest
14                               Washington, D.C. 20579

15   For the Defendant:          NORMAN PATTIS, ESQ.
                                 Pattis & Associates, LLC
16                               383 Orange Street
                                 First Floor
17                               New Haven, CT 06511

18

19

20

21   Official Court Reporter:    SARA A. WICK, RPR, CRR
                                 333 Constitution Avenue Northwest
22                               Room 4704-B
                                 Washington, D.C. 20001
23                               202-354-3284

24
     Proceedings recorded by stenotype shorthand.
25   Transcript produced by computer-aided transcription.

```
 1                    P R O C E E D I N G S
 2          (Call to order of the court.)
 3              COURTROOM DEPUTY:  We are on the record in Criminal
 4     Case 23-427-1 and Criminal Case 24-238, United States of America
 5     versus Dan Edwin Wilson.
 6          Starting with the government, please approach the podium
 7     and state your appearance for the record.
 8              MR. MARIANO:  Good morning, Your Honor.  Anthony
 9     Mariano for the United States, joined by my co-counsel, Mindy
10     Deranek.
11              MR. PATTIS:  Good morning, Your Honor.  Norm Pattis on
12     behalf of Mr. Wilson.
13              THE COURT:  Good morning, Mr. Pattis, Mr. Wilson.
14              PROBATION OFFICER:  Good morning, Your Honor.  Sherry
15     Baker on behalf of the Probation Office.
16              THE COURT:  Good morning, Ms. Baker.
17          All right.  We are here for sentencing.  I've reviewed the
18     government's exhibits, as well as both parties' sentencing
19     memoranda, including the defendant's reply.  I've reviewed the
20     presentence investigation report and the sentencing
21     recommendations of the probation officer.
22          Let me ask Mr. Pattis, Mr. Pattis, have you had adequate
23     time to review the final presentence report with your client and
24     make any objections?
25              MR. PATTIS:  Yes, Judge, we have.
```

1          THE COURT:  Have all those been resolved?  It appears
2    that they have been.
3          MR. PATTIS:  Yes, they have.
4          THE COURT:  All right.  Thank you.
5     And, Mr. Wilson, you can stay there.  I just want to make
6    sure that you had adequate time to review the presentence report
7    with your attorney --
8          THE DEFENDANT:  Yes, ma'am.
9          THE COURT:  -- and you had a chance to make any
10   corrections to the report?
11         THE DEFENDANT:  Yes, ma'am.
12         THE COURT:  And it's completely accurate in terms of
13   the facts alleged in the report?
14         THE DEFENDANT:  Yes, ma'am.
15         THE COURT:  All right.  And how about from the
16   government?  I see there were minimal revisions based on your
17   objections.  Any remaining objections from the government?
18         MR. MARIANO:  No remaining objections, Your Honor.
19         THE COURT:  Very well, then.  I will accept the
20   presentence report as my findings of fact for purposes of this
21   sentencing.
22     Let's start with -- actually, I don't think that there -- I
23   know there's a big dispute about whether the Court should vary
24   or depart upwards in this case in light of *Brock* and for other
25   reasons that the government argues.

1    But aside from that, it appears that the parties are both

2    in agreement with the guidelines calculations, except that the

3    government encourages the Court to calculate the guidelines

4    separately for each offense; correct?

5          MR. MARIANO:  Yes, Your Honor.

6    May I approach briefly?

7          THE COURT:  Yes; yes.

8          MR. MARIANO:  The only other item that I spoke briefly

9    with Mr. Pattis about before this hearing is, we had reserved

10   the right in the plea agreement to argue for an aggravated role

11   enhancement.  We ultimately did not seek that.  The defense did

12   not reserve the right to argue for a mitigating role, but they

13   did argue it in their filing.

14   I'm not sure if Mr. Pattis is pressing that or not, but I

15   wanted to raise that as another potential dispute.

16         THE COURT:  I see.  While you're up here, Mr. Mariano,

17   it's interesting to the Court the way in which the government

18   has charged this.

19   So there was the pending case that was pending for some

20   time in the other jurisdiction.  What was that?  Kentucky?

21         MR. MARIANO:  The Western District of Kentucky.

22         THE COURT:  All right.  And if that case had been

23   prosecuted on its own, am I correct that the guideline range for

24   those offenses would be somewhere around 30 to 37 months?

25         MR. MARIANO:  Let me just grab my guidelines book,

1    Your Honor.

2        So it would have been offense level 22 minus 3 for

3    acceptance of responsibility.  You're right.  That would have

4    been 30 to 37 months.

5            THE COURT:  All right.  And that would have put

6    Mr. Wilson in criminal history category II for purposes of this

7    sentencing.

8            MR. MARIANO:  Correct, Your Honor.

9            THE COURT:  So the government's recommendation here is

10    a 60-month sentence.

11            MR. MARIANO:  Yes, Your Honor.

12            THE COURT:  Although the Court could run these two

13    offenses consecutively.

14            MR. MARIANO:  Yes, Your Honor.

15            THE COURT:  Despite the way Probation has done it with

16    the grouping rules, the Court could treat these as consecutive

17    sentences.

18            MR. MARIANO:  Correct.

19            THE COURT:  And if the Court were to do that, are we

20    not potentially in the same -- right at the guideline range the

21    government would be recommending without even an upward variance

22    or departure?

23            MR. MARIANO:  For the Western District of Kentucky

24    counts, I believe as you noted, the guidelines would be 30 to

25    37.

```
 1              For the District of Columbia --
 2                   THE COURT:  It would be 15 to 21; right?  It would be
 3         14?
 4                   MR. MARIANO:  Yes, exactly.
 5                   THE COURT:  So high end of both, 37 and 21, that's 58
 6         months right there.
 7                   MR. MARIANO:  Yes, Your Honor.
 8                   THE COURT:  Without a single variance or departure.
 9                   MR. MARIANO:   Correct.
10                   THE COURT:  All right.  But aside from the issues that
11         you've raised with respect to the parties' arguments under 3553,
12         the parties are in agreement otherwise, as you see it?
13                   MR. MARIANO:  Yes, Your Honor.
14                   THE COURT:  Do you agree with that, Mr. Pattis?
15                   MR. PATTIS:  We do.
16              Do you need me to approach?
17                   THE COURT:  No, that's fine.  Just be sure to speak
18         into the microphone for the court reporter.
19                   MR. PATTIS:  Yes, we are in agreement, Judge.
20                   THE COURT:  All right.  So let me go through the
21         various counts.  For the Section 372 offense, the appropriate
22         guideline is 2J1.2.  The base offense level is a 14.  There is
23         a -- the parties agree there's a two-level enhancement for the
24         scope, planning, or preparation.  That results in a total
25         guideline offense level of 16.
```

1          For the 922(g)(1) offense, the operative guideline is

2     2K2.1.  The base offense level would be a level 20, and plus 2

3     for three to seven firearms, for a total of 22.

4          Now, with respect to that guideline, does it not include

5     enhancement for the serial numbers being obliterated or missing?

6              MR. MARIANO:  I'm trying to pull it up, Your Honor,

7     but we certainly did not put that into the plea agreement.  It

8     doesn't represent an agreement by the parties.  So I'm not in a

9     position to argue for it.

10             MR. PATTIS:  Judge, I don't believe any of the serial

11    numbers were missing.

12             THE COURT:  I thought -- I mean, the PSR reflects that

13    they are.

14             MR. MARIANO:  That is correct from at least one of the

15    firearms.

16             THE COURT:  Ms. Baker, can you direct me to the

17    appropriate paragraph of the PSR on that?

18             PROBATION OFFICER:  Court's indulgence.

19             THE COURT:  So under 2K2.1(b)(4), if the defendant --

20    "If any firearm had an altered or obliterated serial number."

21    That doesn't require the defendant's knowledge.  That just seems

22    a strict liability enhancement there.  "Or the defendant knew

23    that any firearm involved in the offense was not otherwise

24    marked with a serial number or was willfully blind or

25    consciously avoided knowledge of such fact, increase by four

1    levels."

2            PROBATION OFFICER:  Your Honor, paragraph 63, page 14.

3            THE COURT:  So I see two firearms.  The M4-style

4    rifles had no visible serial numbers.

5            MR. MARIANO:  And for the record, Your Honor, that is

6    in the Statement of Offense as well at paragraph 32.

7            THE COURT:  Okay.  So the question is -- regardless of

8    what the plea agreement says, the Court's obligation is to

9    properly calculate the guidelines.

10       So the question I have for you all is, is that -- I don't

11   know that that's the same as an altered or obliterated serial

12   number.  And is there any evidence of knowledge or willful

13   blindness that the firearm was not otherwise marked with a

14   serial number?

15           MR. MARIANO:  Yes, Your Honor.

16           THE COURT:  It's a preponderance here.

17           MR. MARIANO:  This is a guideline that I have less

18   frequent exposure with, candidly.  But I take "altered or

19   obliterated" to reflect some affirmative act, not necessarily on

20   the part of the defendant.  Whereas here, the information that I

21   have just says "no visible serial number."

22           THE COURT:  Right.  But that's still covered by

23   (b)(4)(ii) potentially.  "The defendant knew that any firearm

24   involved in the offense was not otherwise marked with a serial

25   number or was willfully blind or consciously avoided knowledge

1    of such fact.  If so, the Court should increase four levels."

2        What's the government's position with respect to that?

3        MR. MARIANO:  I take Your Honor's point on that.  I

4    will defer to the Court.

5        THE COURT:  Come on.  The government has to have a

6    position one way or the other.  Do you think that the facts that

7    you've presented, the evidence before the Court, what's stated

8    in paragraph 63, that the firearms had no visible serial number,

9    is adequate to impose that enhancement?

10       MR. MARIANO:  They had no visible serial number.  He

11   certainly knowingly possessed them.  He had them in his

12   backpacks or cabinets and concealed within clothing.  So I think

13   it is a reasonable conclusion that there was at least willful

14   blindness to that fact.

15       THE COURT:  All right.  Mr. Pattis, what's your

16   position?

17       MR. PATTIS:  I think willful blindness requires some

18   sort of obligation or affirmative duty to know or do something,

19   or it needs to depart from what a reasonable person would do

20   under the circumstances.

21       I've been around a lot of firearm offenses.  And people

22   don't typically, if they acquire them, check to see the serial

23   number.  So I don't think there is sufficient evidence to show

24   willful blindness or knowledge.

25       THE COURT:  All right.  Well, I think this is a close

1    call.  I'm not going to impose the four-level enhancement, but I

2    do note that it is -- the lack of a serial number is an

3    aggravating fact identified in the guidelines, and it is

4    something that the Court can certainly consider as it decides

5    where to sentence Mr. Wilson under 3553(a), even though it's not

6    perhaps -- at least based on the way in which the Statement of

7    Facts is written, the knowledge and willful blindness element is

8    perhaps not certain here.

9         So the Court will not apply it.

10        All right.  So back to the PSR and the guideline offenses.

11   So level 22, total offense level 22, you all agree, for the

12   Section 922(g)(1) offense?

13              MR. MARIANO:  Yes, Your Honor.

14              MR. PATTIS:  Yes, Judge.

15              THE COURT:  And for the Section 5861(d) offense, also

16   goes to the same guideline, 20, base offense level remains 20.

17   So that is -- applying the grouping rules under 3D1.4, that

18   results in an additional point being added?  The parties are in

19   agreement?

20        The driving offense here is the 922(g) offense at a 22.  So

21   we're adding one point under the grouping rules for a total

22   offense level of 23.

23        And then acceptance of responsibility is something also I

24   want to talk about.  In the Court's view, Mr. Wilson is

25   certainly entitled to a reduction for acceptance of

1    responsibility under 3D1.1 for entering a plea to these

2    offenses.  However, the evidence before the Court suggests that

3    he may not be entitled to full acceptance of responsibility.

4         But I will hear both -- I know the government's precluded

5    from affirmatively arguing against the three-level reduction,

6    but I do want you to answer my questions.

7         And that is, why are all these statements since January 6

8    and even in very recent times not relevant to the Court in

9    determining whether he's clearly demonstrated acceptance of

10   responsibility?

11        I'm going to give him the two levels.  But with respect to

12   the third -- I mean, there's no question that the government

13   didn't have to prepare; the Court didn't have to prepare.  So I

14   guess it's not necessarily the third point I'm talking about.

15        I'm just -- I'm asking both parties why the Court should

16   conclude that Mr. Wilson has clearly demonstrated acceptance of

17   responsibility for his offenses.

18             MR. MARIANO:  Your Honor, we typically give this third

19   point for defendants who, like Mr. Wilson, have entered a plea

20   well in advance of trial, as he certainly did here.  But I agree

21   with Your Honor that there are significant -- as to the candor

22   of that acceptance of responsibility and remorse, and I think

23   that's a significant factor that the Court should weigh with

24   respect to the 3553(a) factors.

25        But as a structural matter, we think the third point is an

1    appropriate here.

2              THE COURT:  All right.  Mr. Pattis?

3              MR. PATTIS:  I think the third point is appropriate as

4    well.  The post-arrest and comments thereafter come perilously

5    close to being protected speech.  There is a strong partisan

6    divide in this country, and it remains, and it's my view that

7    many of these January 6 prosecutions come perilously close to

8    prosecuting or seeking enhancements on the basis of protected

9    speech.

10         This may be something you want to argue at a different

11   point in the proceedings under 3355, but I would agree with the

12   government that he is entitled to the third point.  We didn't

13   linger in this case.  We didn't seek protracted hearings on

14   collateral issues.  What caused such delay as there was was the

15   complicating factor of the Western District case.

16         And so I would ask the Court to give the third point.

17             THE COURT:  All right.  Well, I will -- consistent

18   with the plea agreement and consistent with the PSR, I will give

19   the defendant a three-level reduction in acceptance of

20   responsibility, but again, this is another factor that I think

21   is worthy of consideration when we get to 3553(a).

22         In light of all of that, the total offense level for

23   guideline purposes is a level 20.  With a criminal history

24   category I, the guideline range is 33 to 41 months.

25         Both parties are in agreement with that; correct?

```
1              MR. MARIANO:  Yes, Your Honor.

2              MR. PATTIS:  Yes, Judge.

3              THE COURT:  All right.  So I will now give each side

4    an opportunity to allocute, and after I've heard from both

5    sides, if Mr. Wilson would like to address the Court, I will

6    give him that opportunity as well.

7        So I will ask both sides to not repeat everything in your

8    briefs.  Assume that I've read them.  It's fair enough to

9    emphasize the key points, but I don't need -- you need to

10   presume familiarity with your filings.

11             MR. MARIANO:  Yes, Your Honor.  And I will assume that

12   Your Honor is well familiar with our brief regarding the upward

13   departure provisions.  So I will focus on the 3553(a) factors.

14             THE COURT:  So let me just ask you one question about

15   the upward departure provision.  And I will just say at the

16   outset, I'm not going to give the terrorism note 4 departure

17   which is in --

18             MR. MARIANO:  This is 3A1.4.

19             THE COURT:  -- 3A1.4.  I did not give that in *Reffitt*

20   and other cases, and I'm not going to give it here.  I recognize

21   that Judge Mehta gave some of the Oath Keeper defendants an

22   additional point, I think, under that departure.

23       I think in the facts -- based on the facts and

24   circumstances of this case, I think that there are better fits

25   than that departure.
```

1         And with respect to the 2K2.7, that departure provision,

2    which the government has argued, that is appropriate, I think,

3    in this case, particularly when the Court is looking at the

4    impact on the government, right, and particularly in light of

5    *Brock*?

6         MR. MARIANO:  Yes, Your Honor.

7         THE COURT:  So I'm wondering for purposes of that,

8    that departure, whether the government would suggest that the

9    Court fashion any departure under 2K2.7 to be consistent with

10   the enhancement in 2J1.2 that the D.C. Circuit has held does not

11   apply in the guideline calculations for proceedings that involve

12   Congress as opposed to the courts, or at least the government

13   agrees on the facts of this case.

14        MR. MARIANO:  That's exactly right, Your Honor.

15        THE COURT:  All right.  So that would be a three-level

16   enhancement for that departure?

17        MR. MARIANO:  There's a three-level for substantial

18   interference, and there's a plus 8 for -- let me look up the

19   exact provision, but it's for --

20        THE COURT:  For the -- yeah.

21        MR. MARIANO:  -- physical injury or property damage or

22   threatening injury to those things.

23        THE COURT:  Okay.  But given that the departure

24   provision itself refers to disruption of a government

25   function -- the departure reads, "If the defendant's conduct

resulted in significant disruption of a governmental function,"
which I think we all, I hope, can agree it did, "the Court may
increase the sentence above the authorized guideline range to
reflect the nature and extent of the disruption and the
importance of the governmental function affected."

In the Court's view, the nature and extent was great, and
the importance of the government function was critical.

"A departure from the guidelines ordinarily would not be
justified when the offense of conviction is an offense such as
bribery or obstruction of justice."

This does involve 2J1.2, which is an obstruction-related
offense.  Nonetheless, this is by no means the mine run
obstruction case.  So I, despite that language in the departure,
do find that this is not the ordinary obstruction case.

And the departure further provides that "in such cases,
interference with the government function is an inherent
offense."

Again, for the reasons we've discussed, I don't find here,
and so I view the circumstances here as unusual.

But based on that language alone, it's the government's
view that the departure should take into account not only -- not
only 2J1.2(b)(2), which says, "If the offense resulted in
substantial interference with the administration of justice,
increase by three levels."

The D.C. Circuit said in *Brock* that doesn't apply to this

1    case -- or the government agrees here it does not apply.

2                    MR. MARIANO:  Correct.

3                    THE COURT:  So increase by three levels.  That makes

4    sense to the Court.

5         You're also saying consider the eight-level enhancement

6    that 2J1.2(b)(1)(B) provides, which states, "If the offense

7    involved causing or threatening to cause physical injury to a

8    person or property damage in order to obstruct the

9    administration of justice, increase by eight."

10        You're saying both of these involve interference and

11   obstruction of the administration of justice, and therefore --

12                   MR. MARIANO:  Yes, Your Honor.

13                   THE COURT:  -- the departure can include not only the

14   plus 3 -- often, we use guideline provisions as sort of

15   benchmarks to determine how far to depart because the departure

16   provision doesn't address that.

17        You're saying not only three levels but eight levels is

18   appropriate?

19                   MR. MARIANO:  Correct, Your Honor.  In a pre-*Brock*

20   posture, we would have sought both enhancements in this case.

21   So we think 5K2.7 takes into account --

22                   THE COURT:  I know you would have sought both

23   enhancements in this case, and the Court has applied them

24   pre-*Brock* in similar cases.  In those cases, *Reffitt* being the

25   one that comes to mind immediately, the Court made clear -- this

Court made clear that the Court would have applied them under 3553(a) regardless.

We're not at the 3553(a) argument right now, but it seems to me this is an independent basis, which is the departure provision of 2K2.7 coupled with 5K2.0, which says when the guidelines do not take into account a fact that ordinarily would be relevant, that the Court may depart upwards or downwards.

And in this case, I think the combination of 5K2.0 and 5K2.7 do warrant an increase in the guideline levels. But I just hadn't thought about it as for the eight-level as well as the three-level.

But you're leaning on the administration of justice impact there in both?

MR. MARIANO:  Correct.

THE COURT:  So the interference is substantial in the (b)(2), and the interference involves causing or threatening to cause physical injury to a person or property damage in (b)(1) -- say 2J1.1(b)(1)(B); is that fair?

MR. MARIANO:  Yes, Your Honor.

THE COURT:  All right.  So Mr. Pattis, I'm interested in hearing your perspective on that as well, but since we already have Mr. Mariano, let's just go ahead and proceed, but I want to remember to talk to you about that as well.

MR. MARIANO:  So then, Your Honor, let me start with the big picture in this case.

1      Today's August 28, 2024.  We are 131 days away from
2  January 6, 2025.  As Your Honor knows, we have charged hundreds
3  of defendants in this broad January 6 prosecution effort.
4          THE COURT:  Another way of saying that is we're almost
5  four years away.
6          MR. MARIANO:  We're almost four years away?
7          THE COURT:  From January 6, 2021.
8          MR. MARIANO:  Correct.
9      But in every case when we charge it and when Your Honor has
10  to make a determination of guilt, we are laser focused, as we
11  have to be, on what happened on that day and the planning in
12  advance of it.
13      But in imposing a sentence, the Court has to consider not
14  only the conduct on that day but the need to reflect the
15  seriousness, to send a message to the public, and to deter for
16  future events.  So the Court needs to consider not just
17  January 6, 2021, but 2025, 2029, and so on.
18      And what this defendant did is incredibly serious -- so I
19  will start with the nature and circumstances of the offense --
20  because Mr. Wilson is not the typical January 6 defendant.  He's
21  not a defendant who came for a protest and completely
22  unexpectedly found himself at a riot after hearing a speech.
23      He's in the rare class of those defendants who are
24  convicted of conspiracy offenses related to January 6.  And you
25  saw in the weeks following the election and in advance of

1    January 6 just how serious and how violent his aims were.

2              THE COURT:  Let me interrupt you there for a moment.

3         Why is this case not charged with Koontz as a conspiracy?

4              MR. MARIANO:  It was charged with Koontz as a

5    conspiracy.  So, originally, we had -- in the superseding

6    indictment, we charged them together with the 1512(k).  And this

7    was pre-*Fischer*.  We negotiated the 372 plea agreement, which we

8    had also offered to Mr. Koontz.  So they were charged --

9              THE COURT:  Okay.  All right.

10             MR. MARIANO:  So you see how violent and serious his

11   aims were.  He talks about being the tip of the spear, being

12   willing to sacrifice himself, whether it means prison or death.

13        He talked about organizing with militias to walk in armed

14   so that law enforcement could not stop them.  He talked about

15   organizing militias to come into Washington, D.C., together and

16   to be prepared not to come out.

17        He talked about bringing weapons.  He talked about going

18   down swinging.

19        "We have to be willing to not go home and take over."  He

20   asked, "Do we try to take Washington, D.C., first, or do we try

21   to take state capitals first?"  He said that if people followed

22   him, he would show them a symphony of destruction.

23        Now, I expect, as they did in their filing, that the

24   defense will point to the leaders of the Oath Keepers and Proud

25   Boys conspiracies as more serious cases.  And there is no

argument from me there.  Those defendants were charged with

seditious conspiracy, and Mr. Wilson was not.

But what principally distinguishes Mr. Wilson's case, when

you look at his rhetoric in advance and what he was planning,

was that the Proud Boys and Oath Keepers were just more

sophisticated organizers than he was.  They are more effective.

And thank goodness for that.  Thank goodness Mr. Wilson

wasn't the tactician or organizer he aspired to be in terms of

getting people to Washington, D.C., to try to take over and

never leave.

But he transformed his words into action by coming to this

city and storming the Capitol on January 6, and the Court needs

to take that seriously.  The Court should impose a sentence that

reflects the seriousness of his aims and what he did.  The

sentence shouldn't rely on the defendant's continued

ineffectiveness.

I also want to respond to the defendant's argument in his

filings that he was here just to protest.  That is certainly

completely inconsistent with the messages that you've seen in

this case.

THE COURT:  And his conduct.

MR. MARIANO:  And his conduct, yes.

THE COURT:  So you don't need to spend a lot of time

on that argument.

MR. MARIANO:  And the defendant, whether he was less

effective or not, did try to organize with others to storm the Capitol.  Your Honor has seen throughout our filings several messages that he sent not only in Telegram to organize the Coalition of the Unknown, but over Zello, where he was coordinating with the Oath Keepers.

This is just one of those messages.

(Audio played.)

MR. MARIANO:  "The people are pushing on the Capitol. We need all hands on deck."

So I expect the defense will argue to you that Mr. Wilson isn't charged with assaulting anyone or personally destroying property, and that's true.  But what were his aims?  Mr. Wilson may have arrived after the barricades had already been breached and police lines were overrun.  When he went through the Upper West Terrace door and entered the Capitol building, rioters were already inside.

So the fact that he wasn't personally presented with violence may be an instance of moral luck on his part, but it certainly doesn't speak to his aims.

When you listen to this message, the other Zello messages, and when you see all the Telegram messages, you can see plainly how violent and revolutionary his aims were.

And you saw it when he got to the Capitol.  When he was overlooking the riotous crowd, you saw how he was cheering and celebrating, because he thought that the revolution he had been

1  seeking for so long was finally here.  This was the riot the

2  defendant wanted.  It wasn't a mistake.  It wasn't a surprise to

3  him.

4      You saw how he entered the Capitol wearing a gas mask,

5  prepared for resistance and violence.  And while I personally

6  believe that the January 6 conduct is the most serious offense

7  that the Court needs to sentence for today, as Your Honor knows,

8  it's not the only offense that we're here for, because

9  Mr. Wilson is also in the rare class of January 6 defendants who

10  are here for completely unrelated firearms offenses.

11      And the defense, I know, has argued that Mr. Wilson has

12  turned his life around after an incredibly extensive criminal

13  history when he was younger.

14          THE COURT:  Again, I'm just curious, why not -- I

15  mean, that case was pending in Western District of Kentucky for

16  a while.  Why wasn't that just prosecuted --

17          MR. MARIANO:  That would be a --

18          THE COURT:  -- before you brought the case here?

19          MR. MARIANO:  I believe that the defense in that case,

20  the local defense was continuing the case to try to see if it

21  could get resolved here first.  So they were sort of in a

22  posture of deferring to our district, and we were trying to get

23  a plea resolved.

24          THE COURT:  Okay.

25          MR. MARIANO:  So we've talked about the firearms, how

they were concealed in clothing, firearms in a backpack, in a
cabinet, firearms, as Your Honor noted, without serial numbers,
firearms that were loaded.  This wasn't a collection for hunting
purposes or anything else.  These were firearms that were
prepared for ready use.

So when the defense talks about how he's turned his life
around, consider the ongoing lawlessness that this type of
conduct reflects.  He knew that he was a convicted felon, and he
was hoarding these weapons, hiding them within clothing.

THE COURT:  With 4,000 rounds of ammunition?

MR. MARIANO:  Correct, Your Honor.

So then let me turn to deterrence, which, as Your Honor
knows, is critically important in every January 6 case.  And
here, given the defendant's extensive criminal history, the
multiple separate felony offenses, the need for specific
deterrence is particularly acute as well.

And the Court should consider, as you've already noted, the
defendant's complete lack of remorse for his conduct.  As Your
Honor pointed out, there is a distinction between a formal
acknowledgment of guilt, an acknowledgment of the government's
evidence, and that we would be able to prove guilt beyond a
reasonable doubt at trial, and true acceptance of responsibility
that should give the Court confidence that he won't do it again,
true acceptance of responsibility and regret, and we have seen
none of that from this defendant.

1    So unless the Court has any questions, let me end -- sorry.

2    Did Your Honor have a question?

3        THE COURT:  No, go ahead.

4        MR. MARIANO:  Let me end with how the defendant closed

5    out his day on Capitol grounds, as far as we know.

6        He had stormed the Capitol with others.  He had breached

7    the building itself, gone through the Rotunda Statuary Hall, and

8    then he exited onto the east side of the building through the

9    East Rotunda Doors.  And having taken in this scene and seeing

10   the mob outside on the east front, the defendant cheered that

11   they were on national news, and he proclaimed it 1776.2.  And

12   that makes the defendant's revolutionary aims clear.

13       But the defendant's understanding of 1776 is wrong.  The

14   spirit of 1776 is about fidelity to the will of the people above

15   all else.  It's a decision to design a system where we can

16   govern ourselves through a constitutional republic if we can

17   keep it.

18       Nothing about what the defendant did on January 6 or in

19   advance of it was at all in keeping with the spirit of 1776.  It

20   was all an affront to it.

21       So we're asking the Court to impose a sentence that

22   reflects the seriousness of these offenses and the need for

23   deterrence.  We ask the Court to impose a sentence of 60 months'

24   imprisonment.

25       Thank you.

```
 1                   THE COURT:  Thank you.

 2            All right.  Mr. Pattis?

 3                   MR. PATTIS:  That sounds ominous.  All right.

 4                   THE COURT:  Let's start with the departure.  I think

 5      the government has a strong argument that these enhancements,

 6      regardless of whether the Court takes them into account under

 7      Section 3553(a), that it is appropriate for the Court to

 8      consider them under the departure provision 2K2.7.

 9                   MR. PATTIS:  Is it 5K2.7, Judge?

10                   THE COURT:  Did I say 2?  I meant 5.

11                   MR. PATTIS:  Well, I don't think it's appropriate.

12      First, you've read the memoranda.  So I don't want to belabor

13      the point.  The more serious charges here are the firearms

14      charges.  It is correct, I was not involved in the Western

15      District case, I've been involved in this case, and there was an

16      effort, a prolonged effort to move these cases together.

17            I don't know -- the Court has asked why the Western

18      District didn't proceed.  I can't answer better than that.

19                   THE COURT:  No, that's a question for the government.

20                   MR. PATTIS:  Okay.  I asked my client.

21                   THE COURT:  It seems like a short-sided resolution to

22      lump these together and then have to argue for the upward

23      adjustment or departure in order to get the sentence they think

24      is appropriate.

25                   MR. PATTIS:  I think what struck me in the
```

government's sentencing memoranda is just how similar it was to the Proud Boys sentencing memoranda where the charges were seditious conspiracy, to wit, use of authority against the authority of the United States government.

THE COURT:  It's very similar to -- I don't know if you're familiar with Mr. Reffitt.  There are other people who are these sort of want-to-be's, not very effective organizers and leaders who were associated with the Three Percenters and other groups.  So I don't -- I know you're intimately familiar with the Proud Boys.  And based on the verdicts in those cases, those do seem to be among the most serious of the January 6 defendants.

That doesn't mean that Mr. Wilson is a mere protestor or not somebody who wasn't trying very hard to organize and recruit and lead people on January 6.

MR. PATTIS:  The offense of conviction was conspiring, and the crime is conspiring to use force against a police officer, against a law enforcement officer.  I don't know that that is reflective of an intent to interfere with the administration of justice.

THE COURT:  But the Court, you know, can consider relevant conduct at sentencing.

MR. PATTIS:  Understood.  But to that extent, so much of the government's sentencing memo seems to want to sentence him for being a member of a crowd.  I see the Court shaking its

1    head no, but I don't know how else to read it.

2        THE COURT:  Every single January 6 defendant who is

3    prosecuted in this court, the government is making the argument

4    that being a member of a large violent crowd, regardless of

5    whether the individual defendant committed property damage or

6    violence, that that was -- that they were a part of a violent

7    mob and that each person added to the risk.

8        MR. PATTIS:  I understand.  And I'm smirking not to

9    show disrespect to the Court, but I'm reminded of extensive

10   arguments in the Proud Boys case of Tools Theory.

11       THE COURT:  Of what?

12       MR. PATTIS:  Of Tools Theory, how the Proud Boys

13   conspired to use other people in the group as tools and they,

14   therefore, ought to be responsible for what other people did.

15     He's responsible for what he did.

16       THE COURT:  Well, when you're a part of a conspiracy,

17   you can absolutely be held legally responsible for what people

18   you conspired with did.

19       MR. PATTIS:  But there are many that he didn't

20   conspire with.

21       THE COURT:  He was there with Mr. Koontz.  Do you --

22       MR. PATTIS:  Mere presence is a defense to conspiracy.

23       THE COURT:  He pled to conspiracy, did he not?

24       MR. PATTIS:  With Mr. Koontz and others, yes, but not

25   with 1,200 or 1,300 or 1,400 other co-defendants.

1          THE COURT:  Let's talk about their small conspiracy,

2     and let's talk Mr. Koontz's goals and Mr. Wilson's goals

3     together.  We can get away from the large crowd.

4          MR. PATTIS:  Fair enough.

5          THE COURT:  Let's just talk about their statements and

6     their actions, and let's see if they don't reflect more than

7     just mere participation.

8          MR. PATTIS:  He pled to the conspiracy.  He's not

9     arguing that he was making mere abstract calls for violence.  He

10    pled to the conspiracy.  And there was an overt act.  And he

11    knowingly pled to that, and it was a voluntary plea.  It was

12    canvassed in this court, and I know he understands that.

13       The hope was that the electoral count would be stopped,

14    yes.

15         THE COURT:  His hope was that.

16         MR. PATTIS:  Yeah.

17         THE COURT:  And he played a part in that.

18         MR. PATTIS:  Does that amount to interference with the

19    administration of justice?

20         THE COURT:  Absolutely.

21         MR. PATTIS:  What justice was being administered that

22    day?

23         THE COURT:  We can agree to disagree, Mr. Pattis.

24         MR. PATTIS:  Well, it's a fair question.  I took the

25    cert petition for Mr. Lange on the 1512 case.  It was granted,

but the argument wasn't heard on our case.  It was heard on
Mr. Fischer's case.  And the claim there was 1512 doesn't cover
everything.  It's an evidence tampering offense, and I think
administration of justice doesn't cover everything.  It covers
the administration of justice.  Not every act that the
government conducts is conducting the administration of justice.

    Now, I will grant that this is not -- outside the heartland
of what was contemplated by the guidelines, and I don't think
anybody said gee, maybe we should -- or Congress ever said let's
have an offense in case somebody storms the Capitol counting
electoral votes.  I don't think that was foreseeable.

    But I don't think it's a direct hit.  I think the Court has
to decide --

        THE COURT:  But the direct hit is he conspired, and
he's admitted that.  And in considering the scope of the
conspiracy and the nature of the conspiracy, the Court can
consider the purposes, can look at what the official proceeding
was, and look at the --

        MR. PATTIS:  No, it's not an official proceeding here.
This is not 1512.  It's administration of justice, and these are
terms of art that matter, at least to higher courts.

        THE COURT:  Whatever we want to call it.

        MR. PATTIS:  You can't sentence that way.

        THE COURT:  Whatever we want to call that event,
whether we call it an official proceeding, whether we call it

1    just one of the most significant constitutional duties Congress

2    performs in order to effect the peaceful transfer of power in

3    this country, it's an important event that he willfully tried to

4    interfere with.

5            MR. PATTIS:  With all due respect to the Court, and I

6    mean this, and I don't want to sound like a --

7            THE COURT:  We always know every time we say "with all

8    due respect" that something's coming.  Go ahead.

9            MR. PATTIS:  A guy comes down from New England and

10   acts like a wiseacre; I'm not trying to be that man.  It can't

11   be whatever we want to call it and have fair notice --

12           THE COURT:  I want to call it the electoral count

13   vote.  Let's call it that.

14           MR. PATTIS:  No, no, we were talking about obstruction

15   of an official proceeding versus obstruction of administration

16   of justice.  I think these terms matter.

17           THE COURT:  I want to call it obstruction of a really

18   important congressional vote.

19           MR. PATTIS:  For which there is no statute.  And then

20   the Court has to go down and consider relevant offense conduct.

21   And now we're using, as the government wants, an enhancement on

22   the base of the more serious offense, the firearms offense.

23       My contention would be that if the Court were to consider

24   that argument, it should use 16 as the base rather than 20,

25   because now we're bootstrapping using the grouping rules.

1          THE COURT:  You agree that I can consecutively

2     sentence him on these two offenses?  And a stat max on the

3     firearms is, what, ten?

4          MR. MARIANO:  It's ten on each count.

5          MR. PATTIS:  I think that probably would bring a

6     habeas corpus action to the Court.  I don't think Western

7     District of Kentucky counsel, when it sought a Rule 20

8     consolidation for purposes of this, warned my client that

9     notwithstanding that, the Court can say never mind, I'm going to

10    sentence you consecutively.

11         THE COURT:  These are two entirely different offenses.

12    You don't claim that -- he didn't use one of these firearms to

13    commit this offense.  I assume you would contest that, despite

14    the fact that he talked about bringing firearms.

15         MR. PATTIS:  The search was justified because of

16    looking for evidence related to this offense, and now the Court

17    is considering relevant offense conduct.

18         THE COURT:  That justified the search, but these are

19    two stand-alone offenses.

20         MR. PATTIS:  Which were brought together for purposes

21    of plea in contemplation of how the plea agreement would --

22         THE COURT:  Understood.  But the Court has the

23    authority, does it not, to sentence him consecutively on these

24    two offenses?

25         MR. PATTIS:  I think the Court has the authority.  I

```
1   think the Court would be inviting a habeas corpus petition.  I
2   don't think I ever advised him that the Court might use its
3   discretion to impose consecutive sentences.  I know Kentucky
4   counsel didn't.  So you have that right, and he has his
5   appellate rights and his collateral attack rights.
6            THE COURT:  Fair enough; fair enough.  But again, if
7   the Court were to take that approach, we would be looking at a
8   guideline range of 30 to 37 and on top of that 15 to 21.  So
9   that would be the range.
10           MR. PATTIS:  I understand.  And that's within what the
11  government is arguing.
12        I don't know if we're going to transition to the 3353 at
13  some point.
14           THE COURT:  Yes, please.
15           MR. PATTIS:  I would ask the Court to take into
16  consideration, and this is going to sound unusual after the
17  government's argument, rehabilitation.  Mr. Wilson has overcome
18  obstacles that are unimaginable to most people.
19           THE COURT:  I agree.
20           MR. PATTIS:  A father figure requiring him to play
21  Russian roulette, in and out of institutions, homes, and prisons
22  for the better part of his young -- adolescence and young
23  adulthood.  And notwithstanding that, he's become a master
24  electrician and for many years has earned a criminal history I
25  with conduct that complies with the requirements of the law.
```

1          And so I would ask the Court not to impose too harsh a

2     penalty.  He knows he's going to prison.  He's packed.  He's

3     ready to go.  He knows he's being sentenced today and today

4     begins his sentence.  But he's going to resume his life in the

5     community.

6                THE COURT:  Is he voluntarily surrendering now?

7                MR. PATTIS:  Yes.  Well, we agreed as a part of the

8     plea that he would go in today, and the government --

9                THE COURT:  That he does go in today?

10               MR. MARIANO:  Yes, Your Honor.

11               THE COURT:  All right.

12               MR. PATTIS:  So we're --

13               THE COURT:  I agree 100 percent, no child should be

14    subjected to what Mr. Wilson was, and it is a testament to his

15    strength and resilience and determination that he in recent

16    years, after -- I guess he had a period of time in which he was

17    in and out of prison, and for the ten years before January 6 of

18    2021, he appeared to be on a solid track.  We don't know when

19    the firearms offenses happened, but putting that aside, and so

20    yes, I do credit that.

21         I'm concerned, however, with his shift January 6 on and his

22    state of mind in as recent as a few weeks ago.  I look forward

23    to hearing from him today if he wants to address the Court.  But

24    that is deeply concerning, and it's concerning to the Court that

25    he seems to be minimizing his need for any kind of treatment,

```
 1    whether it be alcohol or mental health or otherwise.
 2              MR. PATTIS:  Well, the alcohol thing is interesting.
 3    I read the PSR and saw the amount that he was drinking.  I don't
 4    know what was on his mind or how much he was actually drinking
 5    when these events went on, but it's my view that that's enough
 6    that RDAP should be recommended by the Court.
 7              THE COURT:  And it will be, yeah.  Although I don't
 8    know that he's going to be eligible for a reduction in sentence,
 9    unfortunately, because of the firearms offenses.
10              MR. PATTIS:  I think we've heard that, but
11    nonetheless --
12              THE COURT:  But I encourage him, and I look forward to
13    seeing him upon his release and hearing about the programming he
14    did in prison, which I hope will include RDAP, because
15    100 percent he needs that.
16              MR. PATTIS:  Judge, bear with me for just about two
17    minutes here.
18         The last five years of my law career has been really
19    eye-opening, because I began to represent people that people
20    would consider to be on the far right, down in Texas and
21    throughout the country.
22         Before I became a lawyer, I taught political philosophy at
23    various places, at Columbia included.  And my preoccupation was
24    legitimacy.  What gives strangers the power to tell us what to
25    do.  In the United States, we say it's by consent.
```

1    And my preoccupation in the last five years is what's gone

2  on in this country, you know.  Because I believe it's a

3  full-scale crisis of legitimacy and confidence in our public

4  institutions.

5    And I credit my colleagues with their desire to prosecute

6  and send a message.  But I would urge the Court to consider the

7  people you're sentencing, because this is a man who for whatever

8  reasons believed that an election had been stolen.  I don't

9  think he believes it any longer.  But there are many people out

10  there who continue to harbor these beliefs.

11    Candidly, as an officer of your court, our court, I worry

12  about 2025 and beyond because of the anger I see from one end of

13  the country to the next.  And a lot of that anger is about the

14  sentencings in the January 6 cases.  There is a sense in which

15  the government appears to have gone further than justice

16  requires.  It's not just sending a message to punish those who

17  engaged in bad conduct on the 6th, but it's now trying to reach

18  into the future and warn people.

19    And if you look -- I hope you will read some day the D.C.

20  Circuit Court of Appeals decision that I hope will overturn the

21  Proud Boys convictions.  Because on the day of closing argument,

22  the government abandoned its argument that there was a plan and

23  said that the conspiracy could have been formed instantaneously

24  the moment the barricades were stormed.  But yet, it spent weeks

25  introducing incendiary speech that would have been protected in

1    any other context.

2         And I think the fear in the J6 community, because it has

3    become one, is that we're now at a point where the line between

4    protected speech and criminal speech is blurred, and dissent is

5    going to --

6         THE COURT:  Is what?

7         MR. PATTIS:  Has become blurred.  I'm not arguing that

8    in Mr. Wilson's case.  He pled guilty to conspiracy, and he is

9    guilty of conspiracy.  But he still is outspoken in his speech,

10   and he is still among those who question in some respects the

11   legitimacy of our institutions, and that's a serious problem.

12   That's a serious problem.

13        THE COURT:  And that cuts both ways.

14        MR. PATTIS:  I'm not playing for you.  It does cut

15   both ways.

16        THE COURT:  It cuts both ways.  I agree with you.  We

17   do need to be concerned about the stability of our institutions,

18   and people like Mr. Wilson and others are undermining that by

19   suggesting that this is a -- I watched that 45-minute video that

20   he made talking about "I gotta get the truth out."

21        What is a court to make of that when it's sentencing

22   someone who appears to genuinely believe, after all of the

23   evidence has come out about January 6, after looking at what he

24   was involved in, that someone has that perspective, that this is

25   a political prosecution, that this is all overstated, all of the

injuries, all of the property damage, this is really overstated
and not that important.

MR. PATTIS:  I think you can say that it was
important, but it is overstated, and much more has been made of
it.  January 6 could have been a tragic footnote in our nation's
history.  It's become a chapter.  And it's taken on a life of
its own.  More people were arrested in Seattle last week, and
there will be yet more prosecutions, presumably until the
statute runs.

I don't want to play political science professor here, but
we're a country founded on dissent.  And many people -- I'm not
offended by somebody saying 1776.2.  Many people may be --

THE COURT:  It's not what he -- it's not these words
that he said.  It's the words coupled -- the words are
reflective of his intent, and they form the intent for his
actions, his criminal actions on January 6.

MR. PATTIS:  So the criminal actions is what he's
being punished for, not his political views, but the problem, I
think, in many of these prosecutions is the line has become
blurred.  It's no crime to say today "I need a 1776.3."  Our
institutions are out of touch, are out of control.

THE COURT:  It especially becomes blurred at
sentencings like this when courts are facing January 6
defendants who say they're remorseful and they accept full
responsibility, but just hours earlier or days, they've said the

1    opposite.

2        And it's hard at any sentencing to know, when a defendant

3    is facing the Court, whether they feel true remorse and are

4    truly accepting responsibility.  And when there's all this

5    evidence suggesting that they're just saying what they need to

6    say in that moment to get the most lenient --

7        MR. PATTIS:  No, I understand that, but I just don't

8    want the Court to be blind to the fact that Mr. Wilson isn't a

9    guy who sat around conspiring to rob a bank along with Moe and

10   Louie and they got caught and they're sorry they got caught and

11   will never do it again and they're making other plans to rob a

12   bank.

13       He swims in currents that reflect a crisis in this country,

14   and these court's sentencings, when they become at the extreme

15   level, encourage that divisiveness, because it makes it look as

16   though he's being punished for more than those actions that day.

17       I don't think general deterrence is a factor anymore in

18   these cases.  If there's a person in the United States who

19   believes that come January 6, 2025, it's okay to run into the

20   Capitol, they're not watching the news.  The government's made

21   its point.  So I think --

22       THE COURT:  Regardless of the impact, general or

23   specific deterrence, there are other purposes of punishment.

24   One is rehabilitation.  Another is punishment.

25       MR. PATTIS:  In my view, two years is significant

1    punishment.  I tell clients going in, anybody can do --

2            THE COURT:  For these two separate offenses?

3            MR. PATTIS:  Yeah.

4            THE COURT:  The firearms, the 4,000 rounds and the

5    military-style rifles and other weapons.

6            MR. PATTIS:  Do you know how many of those weapons

7    there are out there right now?

8            THE COURT:  There are plenty, but the fact is, he was

9    forbidden under the law to possess them, and he knew that, and

10   he possessed them.

11           MR. PATTIS:  He did.

12           THE COURT:  So folks have to respect the laws in our

13   country.

14           MR. PATTIS:  He's going to prison.  The question is,

15   for how long?  And it's our view that something on the shorter

16   end rather than the longer end serves the purposes of

17   sentencing, because I don't know that rehabilitation will be

18   served.  He's going to come out a little bit older, and I don't

19   know whether he'll be able to retain -- and I should know; sorry

20   that I didn't check this -- his master electrician's license

21   when he comes out.

22       The thing that I like best about Mr. Wilson in getting to

23   know him, when I read the PSR, I was overwhelmed.  He hadn't

24   discuss any of this with me, and we talked briefly, and I said

25   boy, I thought I had it tough as a kid, my heart really goes out

to you.  He says, I'm not going to let anybody get me down, I'm a winner, I'm not going to get beaten.

Sometimes he leads with his chin, and I suspect some of the rhetoric that you've seen in recent communications is that.  But some of it reflects the broader crisis going on in the community.

And I long -- I long to see the J6 prosecutions end.  I was at my computer --

THE COURT:  You and me both.

MR. PATTIS:  I bet, for you more so than me.  I don't have to take any more of these cases, but I think the wheel determines your fate.

But the day January 6 occurred, I was at home writing a brief, and somebody called and said there's a coup at the Capitol, turn the TV on.  I said did they take communications, have they seized the institutions, did they have an alternative regime?  I said no, it's a riot, leave me alone.  I didn't bother to turn the TV on.

But now we have the government coming up here talking about taking over the government and a threat to our democratic institutions.  The institutions held firm.  The people were erratic that day, and it happens in a democracy.  Passions govern.

And let's not forget, the leader of the free world stood a couple blocks from here telling people the election was stolen.

1    It's not a crime to believe your president, even if the

2    president at that time, at that time was a fool.

3         I had a sentencing before Judge Moss where I made this

4    argument, and he cut me off, Counsel, you're not helping your

5    client.  No lawyer wants to hear that.  But that was my client's

6    state of mind at the time, and it's many still, and it is deeply

7    disturbing.

8         So I would ask the Court to consider something less than

9    what the government asks for in this case, because I think

10   everyone -- a lot of people watch these sentences, and a lot of

11   people want to believe that justice is done in the courts and

12   that justice is measured and it's not simply an angry reaction

13   to a horrible day.

14        THE COURT:  I hear what you're saying, Mr. Pattis.  I

15   understand the sentiments you're expressing.  What's lacking

16   here is a -- there is a lack of self-accountability.  There will

17   be consequences; there have been consequences to Mr. Wilson.

18   And they are of his own making.  And that piece is absent from

19   the discussion, that piece.

20        MR. PATTIS:  I can't supply that for you.  That has to

21   come from Mr. Wilson.  And I think his plea -- Mr. Koontz, who

22   is similarly situated, without the firearms charge, is

23   apparently on his way to trial.

24        I'm co-counsel in a case that I don't think I will

25   participate in the trial with of with a young man who has --

1    Jake Lange.  I took his cert petition to the Supreme Court.

2    He's online talking about a need for a revolution even now.

3    Those are -- that's in a different class all together than

4    Mr. Wilson.

5            THE COURT:  Mr. Wilson is in a unique class of his own

6    because of this significant firearms offense that was pending in

7    the Western District of Kentucky, and he's managed to get a

8    pretty good resolution here.

9            MR. PATTIS:  That's what he bargained for and what he

10   asked us to accomplish for him, and we tried.

11           THE COURT:  But it is -- we can't lose sight of the

12   fact that he's different from Mr. Koontz for that reason alone.

13           MR. PATTIS:  Fair enough.

14           THE COURT:  All right.  Anything more you want to say

15   with regard to the other --

16           MR. PATTIS:  Simply to stress the following, Judge,

17   that if, in fact, the Court upwardly departs, we think the base

18   should be -- for January 6 conduct, the base offense level

19   should be 16 rather than 20, because we think it's

20   double-dipping to add on top of the firearms offense, on top of

21   the 20 those points.

22           THE COURT:  But why?

23           MR. PATTIS:  Because the controlling offense is the

24   firearm offense, and Congress said in the guidelines that that's

25   more serious.  Now, relevant offense conduct is -- for the

1    lesser offense is now being added to the greater offense, in

2    effect accelerating --

3         THE COURT:  Another way to look at it is the Court has

4    these different buckets.  One is the firearm offense, two

5    offenses, and then the January 6-related offense.

6         MR. PATTIS:  I understand.

7         THE COURT:  And when I'm looking at the

8    January 6-related offense, I'm seeing that the guidelines vastly

9    understate the seriousness of the offense.

10        MR. PATTIS:  But it's still that offense with an

11   offense level of 16.  So you would be --

12        THE COURT:  Right.  But I'm going up, potentially --

13   the government wants me to go up, and I've suggested in other

14   cases like *Reffitt* that I would go up 11 levels.

15        MR. PATTIS:  If the Court were to go up, it should add

16   it to the 16 rather than the 20.  We don't think it should do

17   either.  But if they are separate offenses, it's bootstrapping

18   to take the 20 as the base and the relevant offense conduct for

19   the lesser and add the 11 to the 20.

20        THE COURT:  And then do the grouping rules?

21        MR. PATTIS:  Hmm?

22        THE COURT:  And then consider the grouping rules, and

23   the difference that would make is what?  It wouldn't reach the

24   government's recommendation of --

25        MR. PATTIS:  No, it wouldn't.  It's an academic point

1    perhaps.

2              THE COURT:  That's what I was getting at.  Does this

3    make a difference?

4              MR. PATTIS:  If you're getting into the 30s range, no.

5              THE COURT:  Because the offense level for the J6 is --

6    total offense level is 14, and if the Court were to add 11 --

7              MR. MARIANO:  Excuse me.  16, Your Honor, for the

8    extensive scope enhancement plus 2.

9              MR. PATTIS:  I thought the Court was going to get to

10   that when I saw your hand moving on that pad there.

11             THE COURT:  You're saying if the Court were to

12   benchmark any variance and/or departure according to the

13   guideline enhancements for administration of justice, that would

14   be 16 plus 11.  That would be 27.

15         And then on top of that, the firearms offense is --

16             MR. MARIANO:  Plus 1.

17             THE COURT:  Plus 1 on top of that; right?  So we're

18   then at 28; right?

19             MR. MARIANO:  Correct.

20             THE COURT:  And this already takes into account

21   acceptance of responsibility.  So again, we're well above --

22             MR. MARIANO:  Sorry, Your Honor.  Can I just clarify?

23   I think the 28 would be prior to acceptance.  So it would end up

24   at 25, 57 to 71 months.

25             THE COURT:  All right.  I just wanted to make sure

that was an academic point, because I see your point, that the

departure and the variance that the Court is considering, at

least for this purpose, would be more directed at the January 6

conduct, but it does not --

MR. PATTIS:  In the spirit of candor, I didn't find a

case one way or the other on this.

THE COURT:  But I will also say, the Court is

contemplating, and I'm interested in your thoughts here, on, you

know, as we've discussed, the -- I guess you would say with

respect to the adjustment or 3553(a) aggravator being the lack

of remorse, acceptance, et cetera, you would say I'm just

punishing him for his speech and he's allowed to say crazy

things?

MR. PATTIS:  I said that in the Proud Boys case given

the argument the government made.  But we pled here, and I've

explicitly said in the sentencing memo we've waived that

argument.

But I think he is entitled to say crazy things thereafter

because the legitimacy crisis that drove people to the Capitol

that day exists still.

THE COURT:  Fair enough.  But the Court, in assessing

and considering a sufficient but not greater than necessary

sentence, you agree the Court can take into account his frame of

mind, the degree to which he's fully accepted responsibility,

learned his lesson, and is genuinely remorseful and not inclined

to do something similar in the future?  You agree that the Court

can consider those factors?

MR. PATTIS:  Maybe.  And you're saying, how could he

say maybe to the obvious?  And it's for -- in the context of

political speech, there's a problem.

I had another case, I don't recall the judge, Owen Shroyer,

who was an acolyte of Alex Jones, pled.  Oh, it was Judge Kelly

as well, I think.  And at sentence -- it was a trespass offense.

He was on the Capitol steps and no more.  And at sentencing, the

government used his post-arrest speech as an argument that the

Court should consider under 3353 as an aggravating factor, and I

argued that that was unlawful, that -- because the speech that

was argued post-conviction was protected.  It was mere abstract

calls for violence on some future date and political advocacy,

which is a core First Amendment value.

Judge Kelly disagreed.  I took an appeal and just submitted

the brief right away with a request for an appeal bond because

the sentence -- and argued that that was a substantive error

that wasn't waived with the right of appellate -- his appellate

rights in general because the sentence was below the guideline

range.

The D.C. Circuit chose to hold us to the plea agreement and

dismissed.  We took a certiori petition, which was denied.

It would be my position --

THE COURT:  So what did the Circuit do?

1          MR. PATTIS:  It dismissed because the sentence

2     ultimately imposed was less than the sentence -- we waived up to

3     a certain point, and the sentence was below the waiver point.

4          THE COURT:  Oh, I see.

5          MR. PATTIS:  And so the merits of the issue were never

6     raised.

7          But I think it remains a lively issue.  I mean, if you look

8     at the cases in the '60s, I can't recall the precise case, but

9     there was a case where someone said to an industrialist "come

10    the revolution, you're the first person I'm going to line up

11    against the wall and shoot you."  And the person was arrested,

12    and the Supreme Court overturned that and said even

13    revolutionary speech, even speech that urges violence, is

14    protected speech.  Mere abstract calls for violence are

15    protected speech.

16         And so I would say, given the context of the political

17    times in which we live and the activities that the J6 defendants

18    are in post-arrest, I think they can still engage in 1776.3, .4,

19    .5.  That's a long and proud heritage.

20         THE COURT:  Just to push your argument a little bit,

21    let's say hypothetically -- and I know this isn't going to

22    happen because Mr. Wilson is smarter than that.  But say he got

23    up and started going off during his allocution about how unfair

24    this political prosecution is and how this is all a big lie and

25    none of this happened and this is 1776.2 and I'm a prisoner of

political persecution and this is all a big lie.  Those are --
that's speech.

     And the Court can't consider that in deciding where to
sentence him?

          MR. PATTIS:  In a post-plea case, I think the Court
certainly can, yes.

          THE COURT:  But what -- you said post-conviction case.
So what do you mean?  Kelly's case was post-conviction; right?

          MR. PATTIS:  Yes, post a plea.

          THE COURT:  What's the difference between post-plea
and post-trial?

          MR. PATTIS:  At a trial, you've never made any
concessions.  At a plea, you've conceded that you broke the law.
And so Mr. Wilson has conceded that he broke the law by
conspiring.

          THE COURT:  All right.  But a jury has found those
people broke the law.

     I guess just standing at the podium at sentencing --
Section 3553 says that -- 3661 says courts can consider anything
except for, you know, impermissible constitutional factors like
race and --

          MR. PATTIS:  And I would say political speech is an
impermissible constitutional factor.

     Judge, I'm an outlier on this.  I'm not suggesting that
I've got a pocket load of cases.  I'm hoping to make those

1    cases, and I haven't yet.

2         But my view is that whatever the contours of the First

3    Amendment are, and it's certainly evolved a lot in our

4    lifetimes, in the last century, political speech has always been

5    at the heart of it.  And that's something that I believe the

6    Court has a tremendous responsibility to protect.

7         And when the Court suggests that post-conviction political

8    speech can be a factor, you know, this country is rotten, the

9    Justice Department is corrupt, these prosecutions stink, it

10   doesn't mean that he's disavowing his plea.  It may mean that he

11   disagrees with the need to prosecute thousands of Americans for

12   five years over a riot that took place a couple hours one day in

13   January of 2021.

14        This has become a -- it's become a chapter in American

15   history now, not a footnote, and that's the government's choice.

16        So I think Mr. Wilson reserves the right to speak out --

17             THE COURT:  Well, let's not lose sight of the fact why

18   we're here.  The government had nothing to do with people

19   showing up and storming the Capitol.  The government is

20   responding.

21             MR. PATTIS:  The government has everything to do with

22   why we're here.  They chose to prosecute Mr. Wilson, and now

23   they are asking for draconian consequences, and we are asking

24   you to consider something less.

25             THE COURT:  We can agree to disagree on whether these

1    are political prosecutions or not.

2              MR. PATTIS:  My point is, I think any defendant has a

3    right to assert that, but that doesn't mean they're disavowing

4    the plea.

5         Mr. Wilson regrets the conduct he engaged in.  He thinks he

6    was sold a bill of goods by the president.  But he still

7    believes there's something rotten in the United States, and he

8    has the right to speak out about it.

9              THE COURT:  Okay.  Does he want to address the Court?

10             MR. PATTIS:  We talked about that beforehand.  I said

11   let's see what frame of mind the judge is in.

12             THE COURT:  I'm happy to take a break and you can talk

13   to him.

14             MR. PATTIS:  May I have a moment, Judge?

15             THE COURT:  Take as long as you need.

16             MR. PATTIS:  Thank you.

17        (Defense counsel and defendant conferred.)

18             MR. PATTIS:  May we take a brief recess, Judge?

19             THE COURT:  Sure.  I will be in the jury room.

20        (Recess taken from 11:29 a.m. to 11:35 a.m.)

21             THE COURT:  All right.  Mr. Pattis?

22             MR. PATTIS:  With your permission, Mr. Wilson would

23   like to address the Court.

24             THE COURT:  Very well.  Let me just before -- I just

25   had a couple of questions I meant to ask you about.

1        For conditions of supervision, is he receptive to mental

2    health treatment and drug abuse treatment?  I'm going to at a

3    minimum order an assessment, because I think the facts

4    support --

5              MR. PATTIS:  I think ordering the assessment makes

6    sense.

7              THE COURT:  If he doesn't want to participate, those

8    resources can go to someone who does want to participate.

9              MR. PATTIS:  I think that's fair.

10             THE COURT:  And the consent order of forfeiture, you

11   all have agreed to.

12             MR. PATTIS:  Yes.  We're prepared to sign it today.

13   My understanding is a copy was brought in.  I don't know if we

14   need to sign it.

15             THE COURT:  I don't think you need to sign, but we all

16   agree that these firearms and ammunition are forfeited?

17             MR. PATTIS:  Yes, Judge.

18             THE COURT:  And that's what this consent order relates

19   to; correct?

20             MR. PATTIS:  Yes.

21             THE COURT:  And similarly, the plea agreement also

22   provides restitution?

23             MR. PATTIS:  Of 2,000 -- I will be making that through

24   his mother at some point, if you could give us 60 days to get

25   that done.

1          THE COURT:  All right.  But you agree that's

2     appropriate in light of the statutes here?

3          MR. PATTIS:  We agreed to it as a part of the plea

4     agreement, Judge.

5          THE COURT:  Okay.  Nonresponsive.

6          MR. PATTIS:  Well, I mean, a riot that was going to

7     destroy democracy yielding $2.9 million in damage in total for

8     thousands of people doing decades' worth of time?

9          THE COURT:  I'm just saying, you don't contest that

10     he, as one of the many people who were there that day, can be

11     held responsible under the relevant statutes for a portion of

12     that damage, even though he himself did not personally destroy

13     anything?

14          MR. PATTIS:  I'll make it easy for you.  Yes.

15          THE COURT:  Okay.  All right.  Thank you.

16     So I'm going to sign the consent order of forfeiture before

17     I forget.

18     All right.  Mr. Wilson?  Good morning, sir.  You've heard a

19     lot of talk about you by us, and I know it's difficult to sit

20     there, and I'm sure there's lots you would like to say in

21     response, and I understand you would like to make a brief

22     statement.  So I'm happy to hear what you would like to say.

23          THE DEFENDANT:  Yes, ma'am.  I would like to keep it

24     brief.

25     As far as the guns go, I mean, honestly, I'm from Kentucky.

1    We shoot.  I understand.  I accept my responsibility.  I knew I
2    wasn't supposed to have the guns.
3        My only defense, and it's just my Kentucky talk, because
4    I'm going to be like so honest, I'm not trying to put on a fake
5    here.  We all just like guns in Kentucky.  We shoot.  I know I
6    wasn't supposed to have them.  Honestly, I've had most of them
7    for years.
8        I don't commit crime with them.  I'm not out there
9    accosting the streets, selling drugs, anything of that nature.
10   So that's all I really have to say about the firearms.  I accept
11   it.  If the Court would just consider that I haven't used those
12   firearms in an ill-mannered way.
13       January 6, it started way before, and I don't want to get
14   into a lot, but our country was in turmoil.  I believe it still
15   is.  I didn't realize my talk would go that far, you know.  You
16   get two-thumbing it sometimes with a couple of beers in you, you
17   know.
18       I care.  At the end of the day, no matter what, left,
19   right, middle, I got involved with good intentions.  I made
20   mistakes along the way.  I shouldn't have went in that door that
21   day.  I wish I hadn't.
22       That's all I can really say.
23            THE COURT:  All right.  Thank you, Mr. Wilson.
24            THE DEFENDANT:  Yes, ma'am.
25            MR. PATTIS:  Thank you, Judge.

1      THE COURT:  All right.  Anything more either side

2  would like to say before I summarize my reasons for sentence?

3      MR. MARIANO:  No, Your Honor.

4      MR. PATTIS:  No, Judge.

5      THE COURT:  All right.  We've covered a lot of ground

6  here.  Just to review some of the points that we discussed

7  earlier, the Court does believe -- turning first to 3553(a), the

8  Court does believe, as it explained in *Reffitt* -- and I

9  recognize that that was dealing with the 1512 offense.  So I

10  know we're in a different situation here with this conspiracy

11  offense.  But nonetheless, I think the logic still applies.

12      We are going to 2J1.2, and at least with regard to the

13  conspiracy that Mr. Wilson has admitted to, I do believe that

14  the guidelines for 2J1.2 do understate the seriousness of the

15  conspiracy.

16      And although these enhancements, the eight-level

17  enhancement in 2(b)(1)(B) -- sorry, in 2J1.2(b)(1)(B), as well

18  as the three-level enhancement in (B)1.2, although they do not

19  apply, as the Circuit has made clear in *Brock*, I do think that

20  they can form a basis of a significant upward variance.  And so

21  the Court is going to vary.

22      The Court also notes, as we've discussed, that another

23  basis for the increase in offense level is based on the

24  departure provision in 5K2.7, coupled with Section 5K2.0.

25  Again, the Court recognizes that 2K2.7 ordinarily doesn't apply

to obstruction offenses, but I do find this is a rare case and worthy of significant departure for all the reasons we've discussed earlier.

I do believe that the extensive planning, preplanning Mr. Wilson was involved in, the steps he took to organize and rally others in the weeks before January 6 to join him in taking the Capitol by storm, knowing the intent of the riot, and the additional steps he took on that very day to rally people as he watched the police lines fall in response to violent rioters who overran police lines and broke through Capitol windows and doors to enter, I do believe that those -- his actions, again taken with the clear intent to impede Congress from performing a significant constitutional duty that helps ensure the peaceful transfer of power in this country, I do believe that that justifies a significant variance and departure. So these are independent grounds for the Court increasing the offense level.

The Court takes Mr. Pattis's point about the enhancement of the offense being tied to the January 6-related offense. We've discussed how those guidelines would be calculated if the Court did indeed depart or vary upward 11 levels, and ultimately, that would, with the grouping rules, result in a total offense level of 25 after credit for acceptance of responsibility, and that would be a guideline range of 57 to 71 months.

And again, consistent with my earlier ruling in *Reffitt*, the Court is not, however, applying the terrorism adjustment in

1    Section 3A1.4 of the guidelines, Note 4.

2         The government has also argued that Mr. Wilson's criminal

3    history overstates -- or understates the seriousness of his

4    criminal history and, I think, makes basically two arguments in

5    support of that.  One is that this firearms charge could have

6    easily been prosecuted separate from this, in which case

7    Mr. Wilson would be in a criminal history category of II as the

8    Court looked to sentence him on the conspiracy charge.

9         And separate from that, Mr. Wilson has a lengthy criminal

10   history background that includes three separate felonies.

11   Granted, most of that criminal history is dated.

12        Nonetheless, I think that the -- it is understated, but on

13   the other hand, when the Court takes into account the valid

14   grounds for downward variance in this case -- and I do think

15   that Mr. Wilson's childhood was extremely, extremely difficult,

16   and as I've stated, it's admirable and really a reflection of

17   his determination and resilience that he is where he is in terms

18   of his career as an electrician.

19        And so I'm not -- I think that the criminal history

20   understatement is countered by Mr. Wilson's very tragic

21   upbringing.

22        So I think I've covered -- correct me if I'm wrong,

23   Mr. Mariano.  Have I covered all the bases for the government's

24   variances?

25             MR. MARIANO:  Yes, Your Honor.

1          THE COURT:  And what about you, Mr. Pattis?  Did I

2     address -- it was the childhood upbringing?

3          MR. PATTIS:  Yes, Judge.

4          THE COURT:  Moving on to Section 3553(a), the Court is

5     required -- in addition to considering the guidelines, which

6     we've already discussed, the Court is required to consider all

7     of the factors under 3553(a), and the Court has done so.

8          Just in summary, I will say with respect to the nature of

9     the offense, Mr. Wilson was indeed a part of a large violent mob

10    that aggressively stormed the Capitol on January 6, 2021.

11    Regardless of whether he himself was individually responsible

12    for any of the injuries that occurred that day or the damage to

13    the property, he knowingly and intentionally joined, encouraged,

14    and celebrated the mob that both threatened and did in fact

15    injure officers and destroy Capitol property.

16         And there's no question at all that he had the intent to

17    interfere with Congress's vote that day.  And Mr. Wilson

18    explained in his own words that were shared with other rioters

19    and would be rioters on encrypted online and radio platforms

20    that that was the very purpose of his actions on January 6 and

21    his actions leading up to that day.

22         I want to be real clear.  Mr. Wilson is entitled to hold

23    whatever belief about the 2020 presidential election he believes

24    to be true.  He's entitled to express his political views and

25    any other views publicly.

But what he did leading up to and on January 6 was not simply engage in First Amendment-protected vitriolic speech and social media chatter.  He assisted, at least with Mr. Koontz and certainly others who were on the same platforms, Mr. Wilson assisted in planning, organizing, and recruiting for a violent, large-scale riot.

Far from simply showing up outside the Capitol grounds seeking redress for his grievances, as others did that day outside restricted grounds and still others did on restricted grounds but not inside Capitol building, Mr. Wilson was all in. He trespassed on Capitol grounds, knowing he had no legal right to be there.  He went past signs, bike racks, and barricades, most of which were down but obvious to anyone walking by.

After rioters overran a police line, he raised his arms in victory, celebrating.  And minutes after a large crowd violently overcame officers guarding the Capitol building, he entered the building, alarms blaring, and went in wearing a gas mask and carrying what appears to have been a canister of bear spray.

Once inside, he traipsed across the Capitol, taking selfies in the Rotunda and Statuary Hall, repeatedly making the Three Percenters sign with his hands.  12 or so minutes later, he exited the Capitol, and once he exited, he celebrated even more, exclaiming 1776.2.

Again, to be clear, he's not being punished for what he said that day.  His comments that day are reflective of his

intent and the reason why he committed the many violations of law he committed that day.

The government has no evidence that Mr. Wilson brought any of his firearms to the Capitol that day.  There's no question he considered it.  His posts, comments online make clear that he was considering firearms but, I think, ultimately made the decision not to bring them.  I think he was going to save those for a later date.  He considered bringing an expandable baton and admitting to bringing one of those on December 12th when he was here for an earlier riot.  He wore hard-knuckled gloves.

Bottom line is, he actively participated and planned for a full-fledged riot with full knowledge of what was intended.  It was a riot that put every officer and government worker in and around the Capitol that day at great risk.  The fact that Mr. Wilson did not use bear spray, assault an officer, damage property does not mean that he's just a mere protestor that day. And the fact that he's not charged in any larger-scale conspiracy like some of the Oath Keepers and Proud Boys were does not mean -- as he's admitted, he's engaged in a conspiracy.

His messages before January 6 with Koontz and others show active coordination.  That day, Mr. Wilson provided a play-by-play over secured communications platforms.  He said he needed all hands on deck.  He passed updates on to other Oath Keepers groups.  He made pleas for help.

And far from showing any remorse after this event,

1    Mr. Wilson, when approached by the FBI, lied to the FBI.  This

2    is -- after he had a chance to hear about the injuries and

3    deaths that occurred, other destruction that happened at the

4    Capitol that day, he lied about being in the Capitol, he lied

5    about knowing anyone else that had entered the Capitol.

6          Since then, following the convictions of many, including

7    those charged with conspiracies and other serious felonies, he's

8    doubled down.  In recent weeks, he's said he will soon be going

9    to prison for standing up for the people.  He's consistently

10   claimed that he's a victim of political prosecution.  He calls

11   himself a patriot January 6 defendant and views himself as a

12   hero for his actions.  He stated that he's being prosecuted for

13   doing the job of the government and law enforcement.

14         As recently as December 2023, he was interviewed on a show

15   in which he suggested that what happened on January 6 is

16   overstated.  He refers repeatedly in the remarks that I watched,

17   some 45 minutes of them, to "they."  By "they," it's unclear

18   whether he's referring to the government, the courts, or others

19   who have kept the truth from the public.  And he views his role

20   as getting the truth out about what happened on January 6.  It's

21   as though nothing significant happened that day.

22         And he continues to express these sentiments nearly four

23   years after January 6.

24         The Court is considering, in addition to the nature of the

25   offense, considering the personal characteristics of Mr. Wilson.

We've talked about his job.  He also has a GED.  We've talked
about his tragic childhood, which was in and out of numerous
foster homes.  He was physically and emotionally abused by his
parents, who -- his father in particular.

He was on a good track, it seemed, the ten years prior to
January 6, aside from the firearms, which he admits that he's
held.  The fact is, he so far, as the record reflects, committed
no offense for a ten-year period prior to January 6.

I do appreciate what Mr. Pattis has said about individuals
like Mr. Wilson being very frustrated with the way in which
democracy is operating.  And I appreciate that a lot of this
frustration about the direction he views our country is going in
is wrong motivated his actions on January 6.

It concerns the Court that there's a perspective held by,
if not Mr. Wilson himself, others that he's being punished for
his speech as opposed to his actions.  That is not the case.

And I hope that when Mr. Wilson goes to prison, that he can
appreciate and take responsibility for what he did on January 6
and that he might use his talents, use his grit, use his
determination, to be a voice for change.  So far, he's used his
talents to be a voice for attacking the institutions of the
government.

And, Mr. Wilson, you have the power to reach people like
yourself in prison and when you get out of prison who are
disgruntled about the path this country is on.  And I challenge

1   and I look forward to hearing from you -- because there will be

2   a re-entry hearing when you get out of prison.  I challenge you

3   to use this frustration and this energy and direct it in another

4   way that's not attacking the institutions of democracy.

5       And if you really want to make a difference, perhaps that

6   would -- you would be able to have more of an impact in creating

7   the kind of country that you would like to see by using your

8   voice to reach folks like yourself who are disgruntled with the

9   way democracy is operating.

10      We've talked about how Mr. Wilson is differently situated

11  than other January 6 defendants because of the firearms offense,

12  and the Court has noted how that case could have been prosecuted

13  separately and how the Court could sentence Mr. Wilson

14  consecutively on these various offenses.

15      The Court is not going to do that, but the Court revisits

16  the issue because it does illustrate, in the Court's view, what

17  a fair recommendation the government's sentence of 60 months is

18  in this case, when you take into account the fact that the

19  firearms offenses alone would result in a guideline range of 30

20  to 37 months.  And when you couple that with the guideline range

21  that would exist if Mr. Wilson had been prosecuted for that and

22  then later this offense, he'd be looking -- correct me if I'm

23  wrong, but we'd be looking at a guideline range, in criminal

24  history category II, of 18 to 24 months.  So adding those

25  respective cases together is a guideline range that's over, well

1    over 60 months.

2        So I again provide this as an illustration to Mr. Wilson

3    and to others that this is a fair sentence, despite the fact

4    that the Court is varying upwards and departing upwards, has

5    independent bases for increasing the sentence to a level of 60

6    months.

7        The Court will follow the recommendation of the government

8    and sentence Mr. Wilson to 60 months.  The Court does believe

9    that it's sufficient but not greater than necessary to achieve

10   the purposes of punishment.  Putting aside, you know, general

11   and specific deterrence, which the Court does believe it

12   furthers, there is a need for punishment in this case, and that

13   is a big part of the driver of the case.

14       So the Court will now formally impose the sentence,

15   announce the sentence, and then give both sides a chance to

16   object.

17       Pursuant to the Sentencing Reform Act of 1984 and in

18   consideration of the provisions of Title 18 United States Code

19   Section 3553, as well as the advisory sentencing guidelines, it

20   is the judgment of the Court that you, Dan Edwin Wilson, are

21   hereby committed to the custody of the Bureau of Prisons for

22   concurrent terms of 60 months on Counts 1 and 2 in Case

23   24-cr-238 and Count 1 in Case 23-cr-427.

24       You're further sentenced to serve concurrent terms, three

25   years, 36 months, of supervised release as to Counts 1 and 2 in

1    both of these cases.

2        In addition, you're ordered to pay a special assessment of

3    $100 on each count, for a total of $300.

4        While on supervision, you shall abide by the following

5    mandatory conditions, as well as the discretionary conditions

6    recommended by the Probation Office in Part D of the sentencing

7    options of the presentence report.

8        Which I trust, Mr. Pattis, you've reviewed as a part of the

9    presentence report with Mr. Wilson, and there's no need for the

10   Court to repeat them here?

11       MR. PATTIS:  Correct.

12       THE COURT:  All right.  The mandatory conditions

13   include not committing another federal, state, or local crime,

14   not unlawfully possessing a controlled substance, refraining

15   from any unlawful use of a controlled substance, cooperating in

16   the collection of DNA as directed by the probation officer.

17       You must also make restitution in the amount of $2,000 to

18   the Architect of the Capitol, consistent with the plea

19   agreement.  The Court will give Mr. Wilson 60 days, as counsel

20   has asked, for those payments to be made.

21       You shall also comply with the following special

22   conditions:  You shall submit to substance abuse testing to

23   determine if you've used a prohibited substance.  You must not

24   tamper with the testing methods.  You must also participate in

25   inpatient or outpatient substance abuse treatment program and

1   follow the rules and regulations of that program.  The Probation

2   Office will supervise you.

3       You must also cooperate in a mental health assessment and

4   treatment, if necessary, including cognitive behavioral

5   treatment, if recommended.  You must follow the rules and

6   regulations of that program.  The Probation Office will

7   supervise you.

8       You must provide the Probation Office access to any

9   requested financial information and authorize the release of

10  financial information.  That can be shared with the U.S.

11  Attorney's Office.

12      You must not include new credit charges or open additional

13  lines of credit without approval of the probation officer.

14      I will not impose a fine.  I don't find that you have the

15  ability to pay a fine in this case.

16      You must not, knowingly -- you must not flat-out enter the

17  U.S. Capitol building or the surrounding grounds known as

18  Capitol Square and consisting of the square block bounded by

19  Constitution Avenue Northwest and Northeast to First Street

20  Northeast and Southeast, Independence Avenue Southeast and

21  Southwest of First Street Southwest and Northwest without first

22  obtaining the permission of the Probation Office or the Court.

23      Within -- the same holds true for the District of Columbia.

24  You also need permission from the probation officer or the Court

25  to enter the District of Columbia during your supervision.

1    Within 60 days of release from imprisonment, you will

2  appear before the Court for a re-entry progress hearing, and

3  that can be done via video conference if you're being supervised

4  in your home district.

5    And the Court will transfer supervision to the home

6  district.  It will not transfer jurisdiction.

7    Mr. Pattis, it doesn't seem that you're in need of a

8  financial payment schedule?

9         MR. PATTIS:  Correct.

10         THE COURT:  So I will not impose that.

11    Mr. Wilson, you do have the right to appeal your conviction

12  to the U.S. Court of Appeals for the D.C. Circuit if you believe

13  your guilty plea was somehow unlawful or involuntary or if

14  there's some other fundamental defect in the proceedings that

15  was not waived in your plea agreement.

16    Under some circumstances, the defendant also has the right

17  to appeal the sentence to the D.C. Circuit.  The defendant may

18  waive that right as a part of the plea agreement.  However, you

19  have entered into a plea agreement which waives some of your

20  rights to appeal the sentence yourself.  Such waivers are

21  generally enforceable.  But if you believe the waiver itself is

22  not valid, you can present that theory to the appellate court.

23    And under 28 U.S.C. Section 2255, you also have the right

24  to challenge the conviction entered or the sentence imposed to

25  the extent permitted by that statute or your plea agreement.

1        Any notice of appeal must be filed within 14 days of the

2   entry of judgment.

3        If you're unable to afford the cost of the appeal, you may

4   request permission from the Court to file an appeal without cost

5   to you.  On appeal, you may also apply for court-appointed

6   counsel.

7        I can't recall whether I also talked about ensuring that

8   this sentence does not result in unwarranted sentencing

9   disparities.  I have carefully considered the sentences imposed

10  in analogous cases, a couple of which were mentioned in the

11  government's sentencing memoranda that were fairly close,

12  distinguished in certain ways in both aggravating and mitigating

13  ways than Mr. Wilson.

14       But I've considered those, as well as the more serious

15  cases that involve the Oath Keepers and Proud Boys that were

16  sentenced much more severely.  And I've considered this Court's

17  own sentences in cases like *Reffitt*.  And I note that I imposed

18  an 84-month sentence in Mr. Reffitt's case, and here, imposing a

19  60-month sentence, I do think that's proportional, given the

20  various aggravators and mitigators in that case relative to this

21  case.

22       So is there any objection to the sentence as announced

23  before I consider any motions and recommendations?

24            MR. MARIANO:  No, Your Honor.

25            THE COURT:  Any objection?

1              MR. PATTIS:  Without waiving argument previously, no.

2              THE COURT:  Okay.  All right.  I will order that that

3      sentence as announced be imposed.

4          Is there a recommendation as to a facility?

5              MR. PATTIS:  Lexington, Kentucky, please, Judge, given

6      his Kentucky home.

7              THE COURT:  All right.  I will make that

8      recommendation.

9          Mr. Wilson, understand the Court doesn't have the power to

10     order that.  Generally, the Bureau of Prisons does try to

11     accommodate recommendations for institutions that are close to

12     your home, which I'm sure that is.

13         Is there a motion to dismiss any remaining counts?

14             MR. MARIANO:  Yes, Your Honor.

15             THE COURT:  I can't recall if there are any -- if

16     there's a complaint or anything else pending on the docket.  But

17     to the extent there is, that motion is granted.

18             MR. MARIANO:  Yes.

19             THE COURT:  Anything else we need to address?

20             MR. PATTIS:  May we have one moment, Judge?

21             THE COURT:  Of course.

22         (Defense counsel and defendant conferred.)

23             MR. PATTIS:  Nothing further, Judge.

24             THE COURT:  Sorry to interrupt, but looking at the

25     Consent Order of Forfeiture, it says "Consent Preliminary

1    Order."

2         Is there any reason why I can't mark this as a final order?

3              MR. MARIANO:  It can be marked as final, Your Honor.

4              THE COURT:  Do you agree, Mr. Pattis?

5              MR. PATTIS:  I do, Judge.

6              THE COURT:  All right.  Mr. Pattis?

7              MR. PATTIS:  Nothing further.

8              MR. MARIANO:  Excuse me, Your Honor.  We had moved

9    pursuant to the plea agreement to have the defendant detained at

10   the time of sentencing.

11             THE COURT:  All right.  Without objection, that's

12   granted.

13             MR. PATTIS:  Well, now that we've kind of gone outside

14   the plea agreement with respect to the consideration of

15   consecutive sentences, if the Court wants to exercise its

16   discretion and give him a chance to voluntarily surrender --

17             THE COURT:  I didn't impose consecutive sentences.  If

18   the record is at all unclear, I've imposed concurrent sentences.

19             MR. PATTIS:  My client made the request.  So I tend to

20   agree.  We did agree in the plea agreement.

21             THE COURT:  I think you're bound by the plea

22   agreement, and the Court sees no reason to disrupt the agreement

23   of the parties.  So Mr. Wilson is ordered to surrender.

24        Is there anything else from Probation?

25             PROBATION OFFICER:  No, Your Honor.

1          THE COURT:  Okay.  We'll take just a moment.  I think

2     the marshals are being contacted.

3          MR. PATTIS:  May I have one moment, Judge?

4          THE COURT:  Yes.

5        (Defense counsel and Probation conferred.)

6          THE COURT:  All right.  The marshals are on their way.

7     If there's a need for me to come back, you can let me know, but

8     I have another matter at noon.

9        Thank you.

10       (Proceedings adjourned at 12:08 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        CERTIFICATE OF OFFICIAL COURT REPORTER

2

3        I, Sara A. Wick, certify that the foregoing is a

4   correct transcript from the record of proceedings in the

5   above-entitled matter.

6

7

8   /s/ Sara A. Wick                October 23, 2024

9   SIGNATURE OF COURT REPORTER         DATE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25